**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANINE MICHELLE GIBBONS,<br><br>　　　　　　Plaintiff,<br><br>　　　　vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social<br>Security,<br><br>　　　　　　Defendant. | ) Case No. CV 14-2151-JPR<br>)<br>)<br>) **MEMORANDUM OPINION AND ORDER**<br>) **REVERSING COMMISSIONER**<br>)<br>)<br>)<br>)<br>)<br>) |

**I.   PROCEEDINGS**

　　Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed March 10, 2015, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is reversed and this action is remanded for further proceedings.

## II. BACKGROUND

Plaintiff was born on April 1, 1963. (Administrative Record ("AR") 167, 192.) She completed high school and one year of college (AR 305) and worked as a bank teller and retail cashier, but she had not worked full time for more than three months in over fifteen years (AR 58, 197).

On August 6, 2008, Plaintiff submitted an application for SSI, alleging that she had been unable to work since December 1, 2006, because of "[a]nxiety, [PTSD], gla[u]coma, panic attacks, cannot breathe, I cannot be around angry people [because I] get scared that something bad will happen, have blackouts, also cannot be in malls because I feel trapped like in a maze [making] it difficult for me to remember how to get out of there"; "hallucinations"; paranoia; "scared of people"; "feel trapped"; "cannot go into places of business"; and anxiety so "bad that I shake and cannot even write." (AR 167-73, 196.) After her application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (AR 104.) A hearing was held on August 31, 2010, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE"). (AR 54-68.) In a written decision issued October 14, 2011, the ALJ found Plaintiff not disabled. (AR 74-81.) On March 15, 2012, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded for further proceedings. (AR 88-89.)

On August 28, 2012, a second hearing was held, at which Plaintiff, who was still represented by counsel, and lay witness Bob Bodeau testified. (AR 34-46.) On September 11, 2012, the

ALJ issued a written decision in which he found Plaintiff not disabled. (AR 19-28.) On January 13, 2014, the Appeals Council incorporated additional medical evidence into the record but denied Plaintiff's request for review. (AR 1-5.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV. THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial

gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.   The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to assess whether someone is disabled.  20 C.F.R. § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id. If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v). That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 6, 2008, her application date. (AR 21.) At step two, he concluded that Plaintiff had the severe impairments of "post-traumatic stress disorder and depressive disorder." (Id.) At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (AR 24.) At step four, he found that Plaintiff had the RFC to "perform a full range of work at all exertional levels" but with nonexertional restrictions to "simple, repetitive tasks" and "limited contact with coworkers and the public." (Id.) Plaintiff had no past relevant work, but

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

based on the VE's testimony, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy. (AR 27; see AR 65.) Accordingly, he found Plaintiff not disabled. (AR 27.)

**V.  DISCUSSION**

Plaintiff contends that the ALJ erred in (1) assessing the opinions of examining psychiatrist Larry Ratner and examining psychologist Deborah Digiaro and (2) considering the testimony of Plaintiff and lay witness Bodough.

    A.    <u>The ALJ Erred in Assessing the Medical-Opinion Evidence</u>

Plaintiff contends that the ALJ "rejected" the opinions of Drs. Ratner and Digiaro without providing adequate reasons. (J. Stip. at 5-10, 13-14.) Because the ALJ failed to indicate the weight he afforded these opinions or his reasons for discounting any of the doctors' findings and recommendations, remand is warranted.

        1.    <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither. <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician. <u>Id.</u>

When a treating or examining physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. <u>See</u> <u>Carmickle v.</u>

Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31). When a treating or examining physician's opinion is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 416.927(c)(3)-(6).

The ALJ must consider all the medical evidence in the record and "explain in [his] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources." § 416.927(e)(2)(ii) (noting that unless treating physician's opinion is given controlling weight, ALJ must explain weight given to state-agency physicians' opinions).

### 2. Relevant background

On November 7, 2007, Dr. Ratner performed a mental status examination of Plaintiff. (AR 305-06.) He noted that she was separated from her husband, who had physically abused her for 18 years. (AR 305.) She had begun a part-time, volunteer position with the Salvation Army, in which she accepted donations and helped with food distribution. (Id.) She reported suffering panic attacks since 1991, which had become worse in the prior few years, and depression. (Id.) She also had physical injuries inflicted by her husband. (Id.) She had been prescribed psychiatric medication but could not afford it. (Id.)

She lived with and cared for her 23-year-old son, who had autism. (Id.) She cooked and cleaned and arranged rides with friends to get to appointments. (Id.) She anticipated losing

her house because she could not afford the mortgage. (AR 305-06.)

Dr. Ratner noted that Plaintiff was cooperative but had difficulty understanding, remembering, and carrying out simple commands. (AR 305.) He found her to be childlike and helpless and her speech to be mumbled and rambling. (Id.) Plaintiff's thinking was logical and goal directed but tended to be tangential. (Id.) Her insight and judgment were adequate, and she was oriented in all spheres. (Id.) She displayed average intellect with capacity for abstraction, commonsense reasoning, and computation and "fair" working memory. (Id.) She had a flat affect and depressed mood and complained of apathy, sleep problems, and low self-esteem but had no symptoms of psychosis. (Id.) She feared that people would be angry with her or reject her and had nightmares about being physically abused. (Id.) She was able to remember two of three items after 10 seconds, reproduce a geometric design, and carry out written and verbal commands but had difficulty with serial sevens. (AR 305-06.)

Dr. Ratner found that Plaintiff was depressed and had panic attacks, was of average intellect but had problems with working memory, and suffered a fear of criticism, rejection, and anger from others. (AR 306.) Plaintiff was quick to reject Dr. Ratner's suggestions that she seek medication at the public clinic and rent out rooms to help pay her mortgage. (Id.) He opined that she had "mastered the art of helplessness." (Id.)

Dr. Ratner diagnosed PTSD, panic attacks, mood disorder, and avoidant personality traits. (Id.) He noted "problems working" and estimated Plaintiff's Global Assessment of Functioning

("GAF") score at 55.[2] (Id.) He opined that Plaintiff was mildly limited in her capacity to execute daily tasks; understand, remember, and carry out simple instructions; and respond appropriately to changes in work routine. (Id.) He saw no limitations in her social skills and anticipated that she would not emotionally deteriorate at work if supervised by a "friendly and understanding boss." (Id.) Plaintiff's concentration was "poor" but her persistence and pace "would not be hindered as long as she had a friendly and understanding boss." (Id.) She could manage her own funds. (Id.)

On October 25, 2008, Dr. Digiaro, who had a Ph.D. in psychology, performed a "comprehensive psychiatric evaluation" and reviewed a disability report, Dr. Ratner's report, and a treatment note. (AR 342.) Dr. Digiaro noted that Plaintiff drove herself to the exam and was able to complete a questionnaire on her own. (Id.) Plaintiff had recently lost her home to fire and was staying with her father.[3] (AR 343.)

---

[2] A GAF score of 51 to 60 indicates moderate symptoms or difficulty in social, occupational, or school functioning. See Diagnostic and Statistical Manual of Mental Disorders 34 (revised 4th ed. 2000). The Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pts. 404 and 416) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice. Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

[3] At the time of the 2012 hearing, Plaintiff was living in a residential mental-health facility. (AR 36.)

9

Plaintiff had been abused by her father, both physically and mentally. (Id.)  Her second husband, who also physically abused her, had "taken off." (Id.)

Plaintiff reported suffering PTSD symptoms since 1997 and complained of anxiety, difficulty breathing, chest pain, hypervigilance, fearfulness, fluctuating appetite, and flashbacks of her husband's violence. (AR 342.)  She tended to isolate herself and avoid loud noises and crowds. (Id.)  She was unable to recall some past trauma, suffered frequent nightmares, and had an exaggerated startle response. (Id.)

Plaintiff had not been hospitalized for mental symptoms. (AR 343.)  She had been in counseling and taking medication "for a while," but her symptoms had not significantly improved. (AR 342.)  She reported that when she sensed someone was angry with her, she became overwhelmed and unable to function, and that this had led to her termination from her most recent job, in 2005. (Id.)

Dr. Digiaro reported that Plaintiff was neatly and plainly dressed and wore sunglasses throughout the interview. (AR 343.) Her posture was forward leaning, but her gait, motor activity, and mannerisms were normal. (Id.)  She was positive and cooperative and spoke at a normal rate, volume, and pitch, but she had to be directed to focus her thoughts. (Id.)  Dr. Digiaro characterized her thought content as "one of victimization" but found no evidence of hallucinations, delusions, bizarre mentation, or suicidal or homicidal ideation. (AR 344.) Plaintiff's affect was wide-ranging and sometimes tearful, she laughed appropriately, and her mood was anxious. (Id.)

1     Plaintiff was oriented, with good immediate memory and
2 general fund of information.  (Id.)  Dr. Digiaro found her of
3 average intelligence.  (Id.)  She could add, spell forward and
4 backward, interpret a proverb accurately, think abstractly, and
5 categorize items.  (Id.)  Her reasoning was "impulsive and
6 histrionic."  (Id.)

7     Plaintiff woke early, drank coffee, watched TV, made her
8 bed, showered, and did the laundry and dishes.  (Id.)  She did
9 household chores, went to doctor's appointments, shopped, and
10 crocheted.  (Id.)  She had a boyfriend of one year who had a
11 house in Mexico; she was seeking to contact him so that she could
12 live with him.  (AR 345.)  Her concentration, persistence, and
13 pace were intact.  (Id.)

14     Dr. Digiaro diagnosed moderate PTSD, histrionic personality
15 features, and severe psychosocial stressors and estimated
16 Plaintiff's GAF score at 60.  (Id.)  Dr. Digiaro opined that
17 Plaintiff's longtime PTSD had been exacerbated by the loss of her
18 house to fire and that "[s]he has not improved and most likely
19 will not improve in the next 12 months" despite treatment.  (Id.)
20 Dr. Digiaro noted underlying histrionic features, in that
21 Plaintiff was "quite emotional" and her "impressionistic" speech
22 style would complicate resolution of her symptoms.  (Id.)

23     Dr. Digiaro opined that Plaintiff was capable of managing
24 funds; completing simple, repetitive tasks; accepting instruction
25 from "supportive" supervisors; performing consistently without
26 additional supervision; and maintaining regular attendance,
27 "particularly if she were to work alone."  (Id.)  Dr. Digiaro
28 noted mild impairment in performing detailed and complex tasks,

moderate impairment in interacting with coworkers and the public, and moderate impairment in completing the workday or workweek without interruptions from intrusive thoughts and anxiety. (AR 345-46.) Dr. Digiaro opined that dealing with stress encountered in a competitive work environment would exacerbate Plaintiff's PTSD. (AR 346.)

### 3. Analysis

The ALJ summarized the findings of Drs. Ratner and Digiaro but did not indicate what weight he assigned their opinions (or those of other physicians, except those he "reject[ed]"). (AR 23, 26.) The ALJ noted that restrictions to simple, repetitive tasks and limited contact with coworkers and the public were "consistent with the weight of the medical evidence and the functional assessments of record." (AR 26.) He noted that Plaintiff had been diagnosed with depressive disorder and PTSD but that "mental health findings" in the record "were generally mild." (Id.) He noted that "[m]ost" of her assessed GAF scores were 60, indicating only mild impairment in functioning, and that these findings were "credible and consistent with the minor mental health findings." (Id.; see, e.g., AR 482, 345, 301, 299, 289, 274, 270. But see AR 306 (Dr. Ratner finding GAF of 55), 422 (Mar. 2010 GAF of 50), 414 (Feb. 2010 GAF of 50), 292 (Jan. 2009 GAF of 55), 278 (Sept. 2008 GAF of 50), 285 (Aug. 2008 GAF of 41), 294 (Jan. 2008 GAF of 50), 288 (Aug. 2007 GAF of 50).) The ALJ found that "[m]ost consulting and treating psychologists and psychiatrists, including . . . Dr. Ratner [and] Dr. Digiaro . . . , concluded the claimant could perform simple, repetitive tasks and [should have] restricted interaction with coworkers and

the public," consistent with the ALJ's RFC formulation.  (Id.)

Plaintiff contends the ALJ failed to provide specific and legitimate reasons for discounting certain findings made by Drs. Ratner and Digiaro.  (J. Stip. at 9-10.)  Although the ALJ appears to have accepted in large part their findings, he failed to identify any portions of their opinions that he rejected or specify his reasons for doing so, other than his summary of mental-health findings as "generally mild throughout the record" and his indication that certain doctors "concluded that the claimant could perform simple, repetitive tasks and had restricted interaction with coworkers and the public."  (AR 26.) Yet the medical-opinion evidence reflects significant concern regarding Plaintiff's capacity to concentrate, interact with a supervisor, and function despite her symptoms.

Plaintiff notes, for instance, that the ALJ gave no reason for apparently rejecting Dr. Ratner's opinion that Plaintiff would maintain adequate pace and persistence and avoid emotional deterioration only if supervised by a "friendly and understanding boss."  (J. Stip. at 9; see AR 306.)  Dr. Digiaro similarly indicated that Plaintiff could accept instruction only from "supportive" supervisors.  (AR 345.)  It is unclear how this limitation could be incorporated into an RFC and whether such a limitation would effectively bar Plaintiff from employment.  Cf. Knaus v. Colvin, No. 06-12-CV-00425-HZ, 2013 WL 3187205, at *5 (D. Or. June 19, 2013) (noting VE's testimony that existence of "supportive supervision" was "unpredictable" in competitive unskilled workplace and requirement of supportive supervisor, combined with limitations as to pace and acquisitiveness,

precluded employment). Nor did the ALJ directly address Dr. Ratner's finding that Plaintiff's concentration was "poor" (AR 306), which was consistent with repeated notations in treatment notes (see AR 290, 291, 296, 297; see also AR 260, 357 (agency physicians noting moderate impairment in maintaining concentration, persistence, or pace)).

Plaintiff further notes that the ALJ neither acknowledged nor gave a reason for rejecting Dr. Digiaro's finding that Plaintiff's PTSD would be exacerbated by the stress of competitive work.[4] (J. Stip. at 9; see AR 346.) Nor did the ALJ address Dr. Digiaro's opinion that Plaintiff would have moderate difficulty completing a workday or workweek without interruptions from her symptoms (AR 346) or the findings of moderate to very severe occupational impairment by Plaintiff's treating doctors (see, e.g., AR 267, 277, 288, 413, 481). Yet these findings, if accepted, could require greater RFC restrictions and even prevent Plaintiff from maintaining competitive employment.

Because the ALJ failed to provide specific and legitimate reasons for his treatment of the medical opinions and did not assign weights to all of them, reversal is warranted. On remand, the ALJ should specify the bases upon which he weighs the medical-opinion evidence. Because reconsideration of the limitations identified by opining physicians may lead the ALJ to

---

[4] Plaintiff also contends that the ALJ failed to account for Dr. Digiaro's finding that Plaintiff's ability to maintain regular attendance would be enhanced if she worked alone (J. Stip. at 9; see AR 345), but the restriction to "limited contact with coworkers and the public" appears to account for that finding (AR 24).

reassess testimony from Plaintiff and Bodough, the Court does not reach the issue in the Joint Stipulation concerning it.

B. <u>Remand for Further Proceedings Is Appropriate</u>

When, as here, an ALJ errs in denying benefits, the Court generally has discretion to remand for further proceedings. <u>See</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended). When no useful purpose would be served by further administrative proceedings, however, or when the record has been fully developed, it is appropriate under the "credit-as-true" rule to direct an immediate award of benefits. <u>See</u> <u>id.</u> at 1179 (noting that "the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings"); <u>Garrison v. Colvin</u>, 759 F.3d 995, 1019-20 (9th Cir. 2014).

Under the credit-as-true framework, three circumstances must be present before the Court may remand to the ALJ with instructions to award benefits:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose;
> (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

<u>Garrison</u>, 759 F.3d at 1020. When, however, the ALJ's findings are so "insufficient" that the Court cannot determine whether the rejected testimony should be credited as true, the Court has "some flexibility" in applying the credit-as-true rule. <u>Connett v. Barnhart</u>, 340 F.3d 871, 876 (9th Cir. 2003); <u>see also</u>

15

Garrison, 759 F.3d at 1020 (noting that Connett established that credit-as-true rule may not be dispositive in all cases).  This flexibility should be exercised "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." Garrison, 759 F.3d at 1021.

 Here, under Connett, remand for further proceedings is appropriate because the ALJ failed to provide specific and legitimate reasons for discounting the medical-opinion evidence, yet the record also contains evidence suggesting that Plaintiff's workplace functioning would permit her to be employed; indeed, she volunteered for several hours daily at the Salvation Army. The Court thus has doubts as to whether she is in fact disabled.

**VI. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[5] IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this Memorandum Opinion. IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: May 20, 2015

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[5] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."